UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

MILTON D. THORPE,

                Plaintiff,

v.                               Civil Action No. 3:10-CV-797

MECHANICSVILLE CONCRETE, LLC,
d/b/a Powhatan Ready Mix

                Defendant.

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendant's Motion for Summary Judgment (ECF No. 19.) The parties request a ruling on the motion without a hearing. For the following reasons, the Court GRANTS Defendant's Motion.

### I. BACKGROUND

This action involves an employment relationship between Plaintiff Milton D. Thorpe ("Thorpe" or "Plaintiff"), an African-American male, and Defendant Mechanicsville Concrete, LLC d/b/a/ Powhatan Ready Mix ("Powhatan" or "Defendant") that resulted in Thorpe's discharge. Powhatan is a company that produces ready-mixed concrete for the construction and building materials industry.

In February 2001, Powhatan hired Thorpe at-will as a mixer-driver. Upon the termination of a white pump truck operator, Powhatan promoted Thorpe to a pump truck operator, which came with a pay increase. At that time, Powhatan owned two pump trucks—one 28 meters and the other 32 meters—which Powhatan assigned based on seniority. Powhatan already had one pump truck operator, Dan Spencer, a white male.

1

Spencer, more senior, operated the 32-meter truck, and Thorpe operated the 28-meter truck.

Larger trucks pumped at a higher rate and required more experience to operate, so operators of larger trucks earned comparably higher rates. In addition to operating the pump truck, Powhatan sometimes called upon Thorpe to perform other tasks including driving the mixer truck. Despite the job Thorpe was called upon to perform, Powhatan paid Thorpe at the higher pump truck operator hourly rate.

When Powhatan purchased a 36-meter truck, Powhatan assigned Thorpe as the operator, although Thorpe was less senior than Spencer. The 36-meter truck was the largest owned by Powhatan at that time, and Thorpe's new assignment came with a pay raise, which made him Powhatan's highest paid truck operator. Powhatan later replaced the 36-meter truck with a 44-meter truck. Powhatan assigned Thorpe to the 44-meter truck, which again came with another raise. Powhatan gave Thorpe priority on all pumping jobs, regardless of the truck size. Although Thorpe sometimes operated the smaller 32 and 28-meter trucks, Powhatan always paid him at the higher 44-meter pump truck operator rate.[1]

In April 2007, Thorpe's supervisor, Dennis Ryan, resigned from Powhatan and offered Thorpe a position at the new company he was founding. After Thorpe gave Powhatan a two-week notice of resignation, Ted Hinson, Powhatan's General Manager, arranged a meeting with Thorpe to persuade him not to leave Powhatan. Powhatan gave Thorpe a raise comparable to his offer with Ryan, and Thorpe decided to stay with Powhatan.[2] In May 2007, Powhatan was acquired by Titan America, LLC ("Titan").

---

[1] At the time the instant Motion was filed, Thorpe remained the highest paid pump truck operator in the history of Powhatan. (Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem.") ¶¶ 14–15.)

[2] Thorpe claims that Hinson made additional promises, including an additional pay increase. (Def.'s Mem. ¶ 30.)

In July 2007, Thorpe's daughter was killed in an automobile accident.[3] Thorpe claims that Powhatan denied him bereavement leave to attend his daughter's funeral. Further, Thorpe received an insurance settlement from his daughter's death, which he used a portion of to purchase a new Chrysler 300 automobile. Thorpe claims that "[a]s soon as Hinson saw Thorpe's new automobile, Hinson began questioning Thorpe about how much money he was making and telling Thorpe that he was making too much money." (Compl. ¶ 17.) Thorpe alleges that in December 2007, Powhatan cut his pay.[4]

In January 2008, Powhatan hired Gene Estep, Jr., a white male, as a pump-truck operator. According to Powhatan, it hired Estep hoping to acquire Estco Concrete Pumping, Inc. ("Estco Concrete"), a local concrete company owned by Estep's father. "Estco [Concrete] was a regular business partner of Powhatan," but was not a competitor because "[it] did not produce its own ready mix." (Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem.") ¶ 50.) As Thorpe was still operating the 44-meter truck, Estep operated the 32-meter truck.

In April 2008, Thorpe expressed to Powhatan management that he was being discriminated against based on his race with respect to his work assignments and work hours. "Thorpe complained that, *inter alia*, Hinson had cut his pay and that Hinson was treating Estep Jr. preferentially by assigning him more pumping jobs and more overtime pay than he was giving Thorpe."[5] (Def.'s Mem. ¶ 62.)

Later that month, the 44-meter truck that Thorpe had been operating became

---

[3] Powhatan notes, however, that its handbook did not provide for paid bereavement leave. Instead, employees were allowed only unpaid bereavement leave. ("Def.'s Mem." ¶¶ 36–40.)

[4] According to Defendant, it was around this time that "the country, and the construction industry in particular, was entering a severe economic downturn." (Def.'s Mem. ¶ 42.)

[5] Thorpe, however, received more overtime hours and significantly more pay than Estep throughout the time that they worked at the Powhatan together. (Def.'s Mem. ¶¶ 63–64, 80.)

inoperable due to mechanical failure.[6] "Powhatan made the business decision not to fix or replace the 44 meter truck," Def.'s Mem. ¶ 69, but gave Thorpe the opportunity to choose whether he wanted to operate the 32 or 28-meter truck. Thorpe chose the 32-meter truck; therefore, Powhatan reassigned Estep to the 28-meter truck.

In May 2008, Thorpe filed his first EEOC complaint alleging race discrimination and retaliation. (Compl. ¶ 22.) Thorpe alleges that after Powhatan received notice of his EEOC compliant, Powhatan "began treating [him] more negatively . . . [and] continued to a greater extent to subject [him] to less favorable terms and conditions of employment than other employees similarly situated." (Compl. ¶ 23.) Thorpe claims that "Powhatan began trying . . . to cause Thorpe to quit his employment with Powhatan . . ., however, Thorpe would not quit." (Compl. ¶ 24.)

Thorpe claims that on February 25, 2010, "Powhatan advised [him] that it had no work for him." (Compl. ¶ 25.) Thorpe also claims that "Powhatan's policy and practice was that when Powhatan had no work for an employee such as Thorpe, Powhatan had no problem with the employee such as Thorpe accepting temporary employment with any other employer, even a competitor."[7] (Compl. ¶ 26.) Therefore, Thorpe took a work assignment with Ashland Ready Mix Concrete ("Ashland"), "a direct competitor of Powhatan," Def.'s Mem. ¶ 88.[8]

---

[6] Powhatan notes some suspicion that "Thorpe had sabotaged the 44-meter truck; however, Powhatan did not terminate Thorpe over this incident." (Def.'s Mem. ¶ 68.)

[7] Contrarily, Powhatan's handbook provided in relevant part: "Outside employment that constitutes a conflict of interest is prohibited. Employees may not receive any income or material gain from individuals outside Powhatan Ready Mix for material produced or services rendered while performing their jobs." (Def.'s Mem. ¶ 87.)

[8] The record indicates, however, that Thorpe had actually begun working with Ashland on or about December 2009. (Def.'s Mem. ¶ 89 (citing Thorpe's deposition taken on March 28, 2011).) Further, Powhatan claims that the owner of Ashland had family members who were parties to litigation with Titan at that time. (Def.'s Mem. ¶ 88.)

4

On or about February 25, 2010, after Powhatan discovered that Thorpe was working for Ashland, Powhatan informed Thorpe that he would have to resign from Ashland because working for a competitor was against company policy. Thorpe refused to resign unless Powhatan could guarantee him at least 40 hours a week. Powhatan expressed that it could not make such a guarantee, and informed Thorpe again that he needed to resign from Ashland. When Thorpe refused to resign, Thorpe was discharged. Thorpe claims that "[a]fter [his] discharge, Powhatan retained less qualified white employees to perform the duties that [he] performed while employed."[9] (Compl. ¶ 30.) In March 10, 2010, Thorpe filed a second EEOC complaint.

On October 29, 2010, Thorpe filed a Complaint alleging three counts of employment discrimination against Powhatan. Count One alleges a hostile work environment, Count Two alleges wrongful discharge, and Count Three alleges retaliatory discharge. On May 27, 2011, Powhatan filed the instant Motion for Summary Judgment. On September 13, 2011, Thorpe filed his brief in opposition.[10]

## II. LEGAL STANDARD

A motion for summary judgment lies only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

---

[9] However, according to Powhatan, "[a]fter Thorpe ceased working at Powhatan, the next [four] mixer drivers hired on March 1, 2010, . . . [w]ith the exception of [one] . . . [were] black." (Def.'s Mem. ¶ 97.)

[10] As Defendant notes, after numerous extensions and delays in filing a response to Defendant's summary judgment motion, Plaintiff failed to timely file his Opposition to Defendant's Motion for Summary Judgment. Therefore, the Court need not consider Plaintiff's untimely filing and will consider the remaining record in consideration of the Motion. *See McDonald v. Loudoun Bd. of Supervisors*, 2011 U.S. Dist. LEXIS 100478, at *7 (E.D.V.A. Sept. 6, 2011) (citing *De La Vega v. San Juan Star, Inc.*, 377 F.3d 111, 116 (1st Cir. 2004) (nonmoving party who fails to timely file opposition to summary judgment "waives the right to controvert the facts asserted by the moving party in the motion for summary judgment and the supporting materials accompanying it. The court will accept as true all material facts set forth by the moving party with appropriate record support. If those facts entitle the moving party to judgment as a matter of law, summary judgment will be granted." (internal quotation marks omitted))). The Court notes, however, that it would reach the same outcome either way, as Plaintiff's opposition does not add any more of an evidentiary basis for his claims to survive summary judgment.

law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). All "factual disputes and any competing, rational inferences [are resolved] in the light most favorable to the party opposing that motion." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks and citations omitted). In making its decision, a court must look to the affidavits or other specific facts pled to determine whether a triable issue exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-49 (1996). Where there is no genuine dispute as to any material fact, it is the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (internal quotation marks omitted). "Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law." *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 308 (4th Cir. 2006). Summary judgment should not be granted, however, if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 258.

### III. <u>DISCUSSION</u>

#### A. Hostile Work Environment

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). Because "an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action." *E.E.O.C. v. Central Wholesalers, Inc.*, 573 F.3d 167, 174 (4th Cir. 2009) (internal quotation marks omitted) (quoting *E.E.O.C. v. R & R Ventures*, 244 F.3d 334, 338 (4th Cir. 2001)).

6

To survive summary judgment on a claim of a hostile work environment based on race, Plaintiff must show that a reasonable jury could find that Defendant subjected him to harassment that was "(1) unwelcome, (2) based on [Plaintiff's] race, (3) sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive atmosphere, and (4) imputable to [Defendant]." *Central Wholesalers*, 573 F.3d at 174–75.

Plaintiff identifies several possible acts of harassment by Defendant: in July 2007, Defendant denied Plaintiff's request for paid bereavement leave; in fall 2007, after Plaintiff purchased a new car, Defendant began questioning him about how much money he was making and said that he was making too much money; in December 2007, Defendant decreased Plaintiff's wages; in January 2008, Defendant hired Estep, a white male, and gave him preferential treatment over Plaintiff in terms of working assignments and hours; after Plaintiff filed his first EEOC complaint in May 2008, Defendant subjected him to less favorable treatment than other similarly situated employees; Defendant acted against Plaintiff in an attempt to make him quit his job; Defendant told Plaintiff that he could not work for Ashland although Defendant told Plaintiff that it did not have any work for him and generally allowed its employees to work for other employers, including competitors, under such circumstances; and Defendant fired Plaintiff and stated two false reasons for doing so.

Beyond Plaintiff's own assertions, however, he fails to point to any specific evidence in the record to establish that Defendant's actions were based on his race or that Defendant's actions were sufficiently severe or pervasive as to alter the conditions of his employment or create an abusive environment. Therefore, Plaintiff cannot support a hostile work environment claim. The record does not establish that a reasonable juror could conclude otherwise. Rather, the record tells a tale perhaps of an employment relationship gone awry.

As Plaintiff admits, Defendant encouraged Plaintiff not to leave when Plaintiff considered leaving to work with Defendant's former employee (Ryan). However, something eventually seems to have triggered a not so harmonious relationship between the two. If indeed jealously grew out of Plaintiff's purchase of a new automobile, Plaintiff fails to establish that such jealously or any actions taken by Defendant with respect to Plaintiff's employment were because of his race. Because Plaintiff has failed to make such a showing, he cannot sufficiently support his hostile work environment claim, and summary judgment is appropriate in favor of Defendant. *See Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985) (noting that "the nonmoving party [to a motion for summary judgment] must produce specific facts . . . rather than resting upon the bald assertions of his pleadings" (internal citations and quotation marks omitted)).

### *B. Wrongful Discharge*

Plaintiff also claims that Defendant terminated him on the basis of race in violation of Title VII and 42 U.S.C. § 1981.[11] Title VII prohibits an employer from "discharg[ing] any individual . . . because of [his] race." [12] 42 U.S.C. § 2000e-2(a)(1). Because Plaintiff does not provide direct evidence of race discrimination, he must establish his claim by circumstantial evidence under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Worden v. SunTrust Banks, Inc.*, 549 F.3d 334, 341 (4th Cir. 2008). "Regardless of the type of evidence offered as support, . . . 'the ultimate question is whether the plaintiff was the victim of intentional discrimination.'" *Hill v. Lockheed Martin Logistics*

---

[11] The elements of a prima facie case under Title VII and § 1981 are the same. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 n.1 (citing *Gairola v. Commonwealth of Va. Dept. of Gen. Servs.*, 753 F.2d 1281, 1285 (4th Cir. 1985)).

[12] Section 1981 provides in pertinent part that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . . 42 U.S.C. § 1981(a).

*Mgmt.*, 354 F.3d 277, 286 (4th Cir. 2004) (quoting *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 153 (2000)).

Under the *McDonnell Douglas* framework, Plaintiff must first establish a *prima facie* case of discriminatory discharge. *See McDonnell Douglas Corp.*, 411 U.S. at 802. To establish a prima facie case for discriminatory discharge, Plaintiff must show that: (1) he is a member of a protected class; (2) he suffered from an adverse employment action; (3) he was meeting his employer's "legitimate expectations" at the time of the adverse employment action; and (4) the position remained open or was filled by a similarly qualified applicant outside the protected class. *Murray v. United Food & Commercial Workers Union*, 100 Fed. App'x 165, 171–72 (4th Cir. 2004); *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003). If Plaintiff makes such a showing, the burden then shifts to Defendant to proffer a legitimate, non-discriminatory reason for Plaintiff's discharge.

Here, Defendant argues that Plaintiff cannot establish a prima facie case of discriminatory discharge because Plaintiff was not meeting its "legitimate expectations" at the time of his discharge in that Plaintiff "flatly and openly refused to comply with [Defendant's] legitimate expectation that he would comply with [Defendant's] conflict-of-interest policy."[13] (Def.'s Mem. 25.) Viewing the evidence in the light in the most favor to Plaintiff, the Court will assume for argument's sake that Defendant had not made its "outside employment" policy clear to Plaintiff, and that Defendant had allowed its employees to work for competitors when Defendant could not offer its employees work.[14] Thus,

---

[13] Defendant also argues that Plaintiff did not suffer adverse employment action, given that Plaintiff "*chose* not to continue working for [Defendant]" after Defendant gave Plaintiff the option of resigning from Ashland or remaining with Defendant. (Def.'s Mem. 21. (emphasis in original).) The Court will assume this element, as Plaintiff's claim fails on other grounds.

[14] The Court acknowledges that this is somewhat of a stretch given that the record establishes that Plaintiff's discharge was the result of his refusal to resign from Ashland, rather than his decision to work for Ashland

assuming, *arguendo*, that Plaintiff was meeting Defendant's "legitimate expectations" at the time of his discharge and that Plaintiff has made a prima facie showing of discriminatory discharge, Defendant must give a legitimate, non-discriminatory reason for Plaintiff's discharge.

Here, Defendant proffers that Plaintiff was fired because of his refusal to resign from Ashland, which as Defendant warned Plaintiff, created a conflict of interest. Defendant's handbook also spoke to such conflicts, and Defendant gave Plaintiff the opportunity to keep his job if he would agree to resign from Ashland. According to Defendant, and Plaintiff does not dispute, Plaintiff refused to do so and was discharged. Hence, Defendant has met its burden of presenting a legitimate, non-discriminatory reason for Plaintiff's discharge. The Court notes that Defendant's reason need not be "wise, fair, or even correct . . . as long as it truly was the reason." *Kess v. Mun. Emps. Credit Union of Balt., Inc.*, 319 F. Supp. 2d 637, 645–46 (D. Md. 2004). Further, Defendant "need not persuade the [C]ourt that it was actually motivated by the proffered reason[s]." *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981). Rather, Defendant must simply set forth admissible evidence explaining Plaintiff's discharge, as Defendant's burden is one of production and not of persuasion. *Id.*

Because Defendant has met its burden of production, Plaintiff must establish that Defendant's reason was a pretext for discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 804. A plaintiff's bald assertions about a defendant's "subjective motivations are [in]sufficient" to make such a showing, however. *Kess*, 319 F. Supp. 2d at 646. Rather, a plaintiff must submit evidence sufficient to "create genuine [disputes] of material fact on whether . . . [Defendant's] reason[] was pretextual." *Mack v. Aiken Elec. Co-op., Inc.*, No.

---

without Defendant's knowledge or approval. (*See* Compl. 29; Def.'s Mem. ¶¶ 89–94.) Furthermore, Plaintiff fails to offer any evidence that his position was held open or filled by a non-black employee after his discharge.

10

92-1322, 1992 U.S. App. LEXIS 29965, at *9 (4th Cir. 1992). Although Plaintiff alleges that Defendant has "stated two different false and pretextual reasons for [his] discharge," Compl. ¶ 29, he has failed to produce any evidence on the record whatsoever that Defendant's proffered reason for Plaintiff's discharge was a pretext for discrimination, and therefore, summary judgment is appropriate in favor of Defendant on Plaintiff's wrongful discharge claim.

### *C. Retaliatory Discharge*

Lastly, Plaintiff claims that Defendant terminated him in retaliation for engaging in protected activity under Title VII and § 1981. Title VII makes it unlawful "for an employer to discriminate against any of [its] employees . . . because [the employee] has opposed any practice made an unlawful employment practice [under Title VII]." 42 U.S.C. § 2000e-3(a). Retaliation claims are also analyzed under the *McDonnell Douglas* framework. *See Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006) (en banc) (noting this expressly). Therefore, the Court must first determine whether Plaintiff has stated a prima facie case of retaliation. To state a prima facie case of retaliation, Plaintiff must establish that: (1) he engaged in a protected activity, (2) the employer took adverse action against him and (3) there was a causal connection between the protected activity and the adverse action. *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007). Here, Defendant argues that Plaintiff has failed to satisfy a prima facie showing of retaliatory discharge because Plaintiff cannot establish a causal connection between his discrimination complaints and his discharge. According to Defendant, "[t]he length of time between [Plaintiff's] internal complaint of discrimination and his discharge (almost two years), and the length of time between [Plaintiff's] EEOC charge and his discharge (approximately one year and nine months), is far too long to

support any causal connection between those protected activities and his discharge." (Def.'s Mem. 25.)

To establish a causal connection, Plaintiff must be able to show that he was discharged *"because* [he] engaged in a protected activity." *See Holland v. Wash. Homes, Inc.,* 487 F.3d 208, 218 (4th Cir. 2007) (quoting *Dowe v. Total Action Against Poverty in Roanoke Valley,* 145 F.3d 653, 657 (4th Cir. 1998)). In determining whether a plaintiff has sufficiently established a causal nexus in support of a prima facie case for retaliation, temporal proximity between the protected activity and adverse employment action is a key consideration. *See Lettieri v. Equant,* Inc., 478 F.3d at 650. The Fourth Circuit has held that "evidence that the alleged adverse action occurred *shortly* after the employer became aware of the protected activity is sufficient to 'satisfy the less onerous burden of making a prima facie case of causation.'" *Dowe,* 145 F.3d at 657 (quoting *Williams v. Cerberonics, Inc.,* 871 F.2d 452, 457 (4th Cir. 1989)). The opposite has also been held true. *See Causey v. Balog,* 162 F.3d 795, 803 (4th Cir. 1998) ("A thirteen month interval between the charge and termination is too long to establish causation absent other evidence of retaliation."); *Dowe,* 145 F.3d at 657 ("A lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action ... negates any inference that a causal connection exists between the two."). Here, the lapse in time between Plaintiff's protected activity and discharge prevent Plaintiff from making a causal showing in support of his claim for retaliatory discharge. Plaintiff has failed to show that any of Defendant's actions, including Plaintiff's discharge, were because of his complaints of race discrimination (protected activity). Therefore, Plaintiff has failed to establish a prima facie case of retaliatory discharge.

Furthermore, even had Plaintiff established a prima facie case for retaliation, Defendant has proffered a legitimate, non-discriminatory reason for Plaintiff's discharge—Plaintiff's refusal to resign from Ashland—and Plaintiff fails to set forth any evidence that would create genuine disputes of material fact on whether Defendant's stated reason was pretextual. Therefore, summary judgment is appropriate in favor of Defendant on Plaintiff's retaliatory discharge claim. Accordingly, the Court GRANTS summary judgment in favor of Defendant on each of Plaintiff's claims.

### III. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's Motion for Summary Judgment.

Let the Clerk send a copy of this Memorandum Opinion to all parties and counsel of record.

An appropriate order shall issue.

_____/s/_____
James R. Spencer
United States District Judge

ENTERED this __26th__ day of March 2012.